**UNITED STATES DISTRICT COURT FOR THE**
**WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| LIFEMD, INC.; | ) |
| | ) |
| JUSTIN SCHREIBER; | ) |
| | ) |
| and | ) |
| | ) |
| STEFAN GALLUPPI | ) |
| | ) |
|     Plaintiffs, | ) |
| | ) |
| v. | ) |
| | )    C.A. NO._2:21-cv-640_ |
| CHRISTIAN MATTHEW LAMARCO; | )    **JURY TRIAL DEMANDED** |
| | ) |
| CULPER RESEARCH; | ) |
| *an entity whose true name/address is presently unknown* | ) |
| | ) |
| and | ) |
| | ) |
| JOHN/JANE DOES 2-10 | ) |
| *individuals, corporations, organizations, or other legal* | ) |
| *entities whose names and addresses are presently* | ) |
| *unknown,* | ) |
| | ) |
|     Defendants. | ) |

## COMPLAINT

Plaintiffs, LifeMD, Inc. ("LifeMD"), Justin Schreiber ("Schreiber"), and Stefan Galluppi ("Galluppi") (collectively "Plaintiffs"), by counsel, as and for their Complaint against Defendants, Christian Matthew Lamarco ("Lamarco"), Culper Research ("Culper"), and John/Jane Does 2-10 (collectively "Defendants") state and allege as follows:

## NATURE OF ACTION

1.     This action arises from a classic "short and distort" scheme.

2.      In such a scheme, short-sellers, working in concert with an involved publisher-generator of false information, borrow securities, sell them, and then drive the price of their target company's stock down by knowingly spreading materially false, misleading, defamatory, and disparaging information about the company.

3.      Once the company's stock drops to an artificially low price, the short-sellers repurchase and return the borrowed securities, pocketing the difference.

4.      This is precisely what Defendants have done against Plaintiffs.

5.      Plaintiffs bring this action to recover substantial damages and to obtain injunctive relief against Defendants for their intentional and malicious scheme to artificially manipulate the securities markets in LifeMD's shares by disseminating and publishing false and misleading statements about LifeMD, Schreiber and Galluppi in order to secure a quick and illegal financial windfall.

6.      These false and misleading statements have caused significant harm to Plaintiffs, including but not limited to severe depression of the value of LifeMD's stock, damage to Plaintiffs' reputation, emotional pain, suffering and humiliation, and causing Plaintiffs to suffer a loss in revenue and incur substantial expenses.

## JURISDICTION & VENUE

7.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because there is complete diversity amongst the parties and the amount in controversy exceeds $75,000.

8.      This Court has personal jurisdiction over Culper Research and John/Jane Does because they purposefully availed themselves of the benefits and protections of the Commonwealth of Pennsylvania by working with Lamarco, a resident of Pittsburgh, Pennsylvania,

2

to defame and commercially disparage Plaintiffs by publishing and/or authoring or contributing to the Culper Report, which was published in Pennsylvania on the Culper Research website and through Twitter.

9.     This Court is a proper venue pursuant to 28 U.S.C. § 1391 because, upon information and belief, a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred within this District.

## PARTIES

10.     Plaintiff LifeMD, Inc. is incorporated under the laws of Delaware with its principal offices located in New York. LifeMD's common stock trades on the NASDAQ exchange under the symbol "LFMD."

11.     Plaintiff Justin Schreiber is an individual residing in Dorado Beach, Puerto Rico, 00901.  Schreiber is LifeMD's Chairman and CEO.

12.     Plaintiff Stefan Galluppi is an individual residing in Huntington Beach, California. Galluppi is LifeMD's Chief Technology Officer.

13.     Defendant Christian Matthew Lamarco is an individual residing at 3934 Foster Street, B410, Pittsburgh, PA 15201.  On information and belief, Lamarco, at all relevant times, directed, authorized, authored and/or was responsible for the publication of defamatory statements made against Plaintiffs by Culper Research.

14.     Defendant Culper Research is an anonymous short-seller that publishes bogus and purported "investigative investment research" reports through its website at www.culperresearch.com and through postings on Twitter as @CulperResearch.  Culper refuses to disclose the individuals or entities behind it; thus, the exact identity of Culper and its cohorts is not known at this time.

15.     Defendants John/Jane Does 2–10, whose true names are unknown, are individuals or entities who worked in concert with or for Culper Research in connection with publication and dissemination of the intentionally false and misleading statements about Plaintiffs that Culper Research made public in an internet posting and on Twitter, including members, partners, affiliates, employees, consultants, clients, investors, agents, and/or counsel of or for Culper Research. Plaintiffs will seek leave of court to amend this Complaint and insert the true names of John/Jane Does 2-10 in place of their fictitious names when the same become known to Plaintiffs.

## FACTUAL ALLEGATIONS

**Background Information**

16.     LifeMD$^{TM}$ is a leading telehealth company that is transforming the healthcare landscape with direct-to-patient product and service offerings. LifeMD's telemedicine platform enables virtual access to affordable and convenient medical treatment from licensed providers and, when appropriate, prescription medications and over-the-counter products delivered directly to the patient's home.

17.     LifeMD offers a full range of subscription-based proprietary telehealth products and services, including: i) REX MD$^{TM}$ - telehealth for men; ii) Shapiro MD$^{TM}$ - telehealth for hair loss; and iii) Nava MD$^{TM}$ - teledermatology offering for women.

18.     LifeMD strives to build telemedicine brands that combine best-in-class virtual care with prescription medications (if appropriate) and patented over-the-counter products supported by thought-leading physicians and influencers.

19.     LifeMD began as a start-up, financed through multiple rounds of venture capital funding. Some of the most sophisticated institutional investors and advisors in the world have conducted countless hours of extensive due diligence validating LifeMD prior to investing.

20.     LifeMD maintains a network of licensed medical providers and doctors who are board certified to treat patients and dispense prescription medications.

21.     All medical providers prescribing medications for LifeMD brands are regularly monitored for good standing by a third-party company that governs compliance for critical industries such as telehealth.

22.     LifeMD is managed by a seasoned team of experienced and dedicated professionals, including:

- Justin Schreiber (Chairman & CEO) – Schreiber has deep experience in both healthcare and finance and was the largest direct investor in LifeMD prior to the Company raising its first round of institutional capital. Schreiber also serves as the President and founder of JLS Ventures, an investment and capital markets advisory firm that invests in and consults with emerging growth publicly-traded companies. In addition to his capital markets experience, Schreiber previously worked for a global healthcare consulting firm as well as in the foreign currency trading business. He holds a BS in International Business from Elizabethtown College and a BA in International Management from the ICN École de management in Nancy, France; and

- Stefan Galluppi (Chief Technology Officer) – Stefan Galluppi was the Chief Executive Officer of Immudyne PR and the Chief Operating Officer of Immudyne. Galluppi has over ten years of experience in building technology platforms for direct-to-consumer marketing campaigns. Previously, he served as the CTO of Runaway Products, a DRTV driven marketing firm with a core focus on building

and optimizing systems to scale campaigns for maximum efficiency and profitability.

23.    Culper Research is purportedly an independent stock research firm which disseminates its research reports to the public at-large throughout Pennsylvania and the United States via its website, www.culperresearch.com and through other media. It also represents itself to the public as an anonymous short-seller.

24.    On information and belief, Lamarco, as well as others, are employed by, affiliated or associated with, involved in, and/or part of Culper Research.

25.    In June 2019, Culper Research created its presence on the web for the apparent purpose of destroying the reputation of and causing harm to various publicly-traded companies as a means to generate illicit profits through short-selling.

26.    Culper undertook to appear to the public as a reputable equity research firm by creating an entity with the term "Research" in the name, referring to itself as involved in long and short equity research, purporting to undertake extensive inquiry into LifeMD's (and other companies') operations, and even referring to each of its publications as "research reports."

27.    Legitimate equity research firms do not attempt to hide or conceal the authors of their work, are typically affiliated with an investment bank or seek to engage clients to receive ongoing research reports directly by subscription, and do not seek to hide the compensation they might receive as a result of issuing reports.

28.    Culper's principal place of business and state of incorporation, if any, are unknown to Plaintiffs as Culper refuses to disclose any information regarding its own business operations, address, or acting principals.

29.    Culper, through Lamarco and Does, has a history of publishing unfounded, fraudulent "reports" about companies.

30.    At the same time, Culper, through Lamarco and Does, engage in abusive "short-selling" of those respective companies' stocks, creating an excess of sellers over buyers, precipitating a dramatic drop in the market price of the affected shares, in order to reap massive profits at the expense of these companies and their shareholders – the very same fraudulent scheme that they have now deployed against Plaintiffs.

31.    Several other companies, including CytoDyn, Inc. (https://emerginggrowth.com/the-great-cytodyn-otcqb-cydy-bear-raid-fails-to-impress/), Blink Charging (https://finance.yahoo.com/news/blink-charging-responds-short-report-191846518.html), and CleanSpark, Inc. (https://www.prnewswire.com/news-releases/cleanspark-investigating-short-seller-culper-research-301212791.html), have been victim to similar schemes engaged in by Defendants using false and defamatory "investigative research" reports published by Defendants, which have resulted in those companies' stocks plummeting.

**Defendants Publish False and Defamatory Statements Regarding Plaintiffs**

32.    On or about April 14, 2021, Culper, individually and/or in conjunction with Lamarco and Does, published a false and defamatory report concerning Plaintiffs on its website www.culperresearch.com and via Twitter using @CulperResearch.

33.    The Report, titled *LifeMD, Inc. ((LFMD): Redwood Redux at RexMD* (hereinafter referred to as the "Report") (attached hereto as Ex. 1), was distributed globally on the internet and has been disseminated or linked to other widely-read websites, including but not limited to seekingalpha.com and threadreaderapp.com.

34.     Further, numerous "investor alerts" and "class action notices" citing to and quoting the false and defamatory statements were circulated shortly after the Report was publicized.

35.     Defendants' acts in publishing the Report and the Twitter communications are intended solely to drive down the price of LifeMD's common stock so that they may effectuate profitable short sales of that stock.

36.     To that end, Defendants sought to have the Report distributed as widely as possible by providing it – and Culper's Tweets – freely to investor news services on the internet.

37.     The statements, implications, and meanings set forth in the Report that are identified below are among the many false and libelous statements in the Report.

38.     By claiming at the outset of its libelous Report that "all information contained herein is accurate and reliable," Defendants knew and intended that the statements set forth in the Report, including those identified below, would convey false and defamatory implications and meanings concerning Plaintiffs to any person reading it or being informed of its contents and cause panic and uncertainty regarding investment in LifeMD, including and especially in the eyes of LifeMD's shareholders.

39.     The purported "research" and "accurate and reliable information … obtained from public sources" in the Report are expressed in absolute terms, not couched or qualified as opinion.

40.     The statements, implications, and meanings set forth in the Report, including those identified below, were published by Defendants with malicious motives, as part of their desire to damage Plaintiffs and decrease LifeMD's share price for their own personal gain and to the detriment of LifeMD's shareholders.

41.     At the time of the publication of the Report, Defendants acted with actual malice in that Defendants knew, or were recklessly indifferent to the fact, that the defamatory statements, implications, and meanings, including those identified below, were false.

42.     Defendants took no steps to discuss or confirm the contents of the libelous Report with Plaintiffs prior to its publication.

43.     The following false statements, among others, appear in the Report:

- LifeMD "has implemented an autoshipping/autobilling scheme, failed to honor guarantees, and put in place abusive telemarketing practices."  Ex. 1 at 2;

- "[N]umerous LFMD insiders were intimately involved in varying aspects of Redwood [Scientific]'s 'wide-ranging fraud.'"  *Id.*;

- "Life MD CEO Justin Schreiber … was a significant shareholder [in Redwood Scientific]."  *Id.;*

- "CFO Juan Manual Pinero Dagnery and former CFO Robert Kalkstein were also significant Redwood shareholders."  *Id.*;

- LifeMD could be "liable as an instrument to felony distribution of controlled substances."  *Id.*

- "LifeMD paid CEO Schreiber 900,000 shares in 2019 – an exorbitant sum – merely for credit card processing services."  *Id.* at 3;

- "LifeMD executives have [been] involve[d] in material fraud, namely in Redwood Scientific, prior to joining LifeMD."  *Id;*

- "LifeMD now apparently sells OTC ED pills relying on unlicensed doctors."  *Id.*;

- "[A]t least 4 current and past LifeMD executives were intricately involved in Redwood."  *Id.* at 4;

- "LifeMD's corporate presentation … omits Schreiber and Galluppi's involvement in the Redwood Scientific Fraud."  *Id.*;

- LifeMD uses "unlicensed doctors to dispense OTC medications" [and] "is []willfully ignorant of its doctors, or complicit in felonious acts."  *Id.* at 2 & 7;

- LifeMD's statements in a December 2020 press release regarding its launch of its "Veritas MD Telehealth Platform" are "filled with hot air" and show

9

"management's willingness to trumpet promotional material while at the same time sweeping uncomfortable truths under the rug." *Id.* at 8;

- "LifeMD is a cash-burning direct marketing response business. The core driver of Rex MD … is a paid search and web marketing operation which only incinerates more shareholder cash over time." *Id.*

- "[I]nsiders have enriched themselves via related-party transactions." *Id.* at 15.

44.     In addition to the foregoing, the Report contains a myriad of other errors, distortions, and outright misstatements of fact including, but not limited to, LifeMD's treatment of its shareholders and "covering-up" or hiding information from them, its licensing practices, and LifeMD's relationship with BV Global Fulfillment.

45.     Defendants also intentionally provided misleading information by taking information relating to LifeMD's products and financial well-being out of context in order to cause damage and injury to Plaintiffs.

### *Patently False Statements About Involvement With Redwood Scientific*

46.     For example, the Report distorts LifeMD executives' involvement with Redwood Scientific Technologies, Inc. ("Redwood Scientific") and explicitly states that Schreiber and Galluppi were engaged in fraud committed by Redwood Scientific.

47.     This statement is demonstrably false.

48.     No current or former member of LifeMD's management team was involved in decision-making or had significant equity ownership in Redwood Scientific at any time.

49.     Schreiber held only a passive investment and non-controlling interest in the company.

50.     Further, although Galluppi nominally held the title "CTO", he held no equity in Redwood Scientific and resigned in October 2015, departing more than two and a half years prior to the FTC action against Redwood Scientific.

51.     The fact that Schreiber and Galluppi had no involvement in any fraud by Redwood Scientific is confirmed by the filings in *Federal Trade Commission v. Cardiff, et al.,* 5:18-cv-02104 (C.D. Cal. 2018).

52.     The FTC sued Redwood Scientific, other persons, and related entities, asserting unfair and deceptive trade practices.

53.     Neither Schreiber nor Galluppi were sued, and their names do not even appear in the FTC's Uncontroverted Statement of Facts and Conclusions of Law in Support of its Motion for Summary Judgement, the FTC's response to Defendants' Statement of Facts, or the Court's Order Granting Plaintiff's Motion for Summary Judgment, which adopted the facts relied upon by the FTC. *See Federal Trade Commission v. Cardiff, et al.,* 5:18-cv-02104 (C.D. Cal. 2018) DE 423-3, 499-1 & 511.   This information was public and readily available to Defendants when they published the Report.

### *Patently False Statements About LifeMD's Licensing Practices*

54.     The Report outright lies about LifeMD's licensing practices, using Dr. Badii and Dr. Kalter as purported examples of LifeMD's use of unlicensed physicians.

55.     LifeMD's physician network consists of nearly 90 board-certified and monitored medical providers who legally dispense prescription medications.

56.     LifeMD has never allowed an unlicensed medical provider to perform a telehealth consult for any of its brands.

57.     The truth is that Dr. Badii was and still is a medical doctor licensed to treat patients and prescribe prescription medications in multiple states, which can be verified online through a simple web search.

58.     LifeMD, through its own quality assurance processes, discovered in March 2021 that Dr. Badii had been sanctioned by the DEA for issues related to prescribing controlled substances, and was barred from prescribing controlled substances.

59.     LifeMD immediately removed him from their physician network.

60.     LifeMD has never prescribed controlled substances, an elementary fact that could easily be verified by anyone that reviewed the company's website and filings with the SEC.

61.     All treatments and medications prescribed by Dr. Badii for LifeMD were lawful and in compliance with all federal and state laws related to prescribing prescription medicine.

62.     In the case of Dr. Kalter, a web design error inadvertently listed Dr. Kalter as licensed in California rather than Massachusetts, where Dr. Kalter is licensed.

63.     As soon as LifeMD realized the error, it immediately fixed it.

64.     Notably, Dr. Kalter never performed a consult or wrote a single prescription for LifeMD in California, even though he would be permitted to do so pursuant to an executive order signed by California's Governor. This information was readily available to Defendants when they published the Report.

### *Patently False Statements About Veritas MD Telehealth Platform*

65.     In their Report, Defendants question LifeMD's press release claims regarding the Veritas MD Telehealth Platform, stating they are "filled with hot air."

66.     Contrary to the Report's misstatements, LifeMD's disclosures about its digital health platform, formerly known as Veritas MD$^{TM}$, are accurate.

67.     Defendants falsely portray LifeMD as a consumer-facing application, when in fact LifeMD serves as the technological and operational backbone behind the REX MD$^{TM}$, Shapiro

MD$^{TM}$, and Nava MD$^{TM}$ telehealth products. This information was readily available to Defendants when they published the Report.

### *Patently False Statements About LifeMD's Relationship with BV Global Fulfillment*

68.     The Report also misrepresents LifeMD's relationship with BV Global Fulfillment and JLS Ventures, indicating that insiders are improperly enriched by the transaction.

69.     To the contrary, the rates LifeMD has paid and still pays to BV Global are in line with, if not lower than, what many third-party logistics providers charge for comparable services.

70.     In addition, as is typical in contracting with a third-party logistics provider, LifeMD pays the shipping costs in connection with delivery of its telehealth products to consumers.

71.     Notably, LifeMD's relationship with BV Global is prominently disclosed in all of LifeMD's filings, and this relationship has never been flagged or mentioned as an issue in any audit or due diligence by institutions that have invested into LifeMD. This information was readily available to Defendants when they published the Report.

### *Patently False Statements About Schreiber And JLS Ventures Compensation*

72.     In the Report, Defendants falsely state that LifeMD's 2019 Form 10-K indicates that JLS Ventures earned an astounding 900,000 shares for providing credit card processing services to the company, yet these disclosures have been removed in the Company's 2020 Form 10-K.

73.     In fact, neither Schreiber nor JLS Ventures received any compensation for the credit card processing, a fact clearly stated in LifeMD's 2019 Form 10-K; rather, the referenced shares were incentive based, for Schreiber's work as CEO.

**Plaintiffs Suffer Significant Damage as a Result of the Report**

74.     Once the Report was published, it was referenced by numerous financial bloggers and websites.

75.     Following the publishing of the Report, LifeMD's stock price dropped, and it continues to drop.

76.     Moreover, LifeMD has lost potential investors and has suffered injury to its reputation based upon Defendants' publications.

77.     As a direct and proximate result of Defendants' unlawful online smear campaign to sabotage Plaintiffs and LifeMD's business and crash its stock price while keeping a profit from their short sale position, Plaintiffs have suffered reputational harm and economic damages.

78.     In the immediate aftermath of the publication of the false statements and libel in the Report, the price of LifeMD's shares decreased $2.84, or 24%, to close at $9.00 per share on April 14, 2021, and it continues to plummet.

79.     While Defendants published the Report on April 14, 2021, on information and belief, Defendants' attack on LifeMD long before through a "short and distort" scheme.

80.     A short and distort scheme is a form of securities fraud wherein an investor and/or company takes a short position on a stock and then publicly berates the stock to influence it to drop.

81.     Defendants substantially benefitted from the decline in LifeMD's share price because Defendants began taking large short positions in LifeMD two months prior to the release of the Report.

82.     Defendants admit in the Report that the Report's authors had a "short position" in LifeMD in advance of publishing the Report.

83.     These large short positions impacted the valuation of LifeMD and its shares.

84.     While Defendants do not disclose the exact size of the short position, the short interest ratio (the ratio of short interest to float) on LifeMD shares is instructive.

85.     NASDAQ, Inc., the exchange on which LifeMD is publicly traded, publishes the short interest for each issuer on its exchange twice a month. Short interest data is reported on mid-month and end-of-month settlement dates.

86.     On December 31, 2020, the short interest on LifeMD was 18,352 with an average daily share volume of 187,893 – a 9.77% ratio.

87.     On February 12, 2021, the short interest on LifeMD was 420,789 with an average daily share volume of 1,555,062 – a 27.06% ratio.

88.     On March 31, 2021, two weeks before the Report was published, the short interest on LifeMD was 1,152,971 with an average daily share volume of 747,679 – a 154.21% ratio.

89.     Between February 12, 2021, when Defendants' short and distort scheme began, and April 15. 2021, LifeMD's stock price fell from $29.23 to $8.68 per share – a 70.3% reduction in share price.

90.     As a result of Defendants' conduct, Plaintiffs have been irreparably harmed.

91.     Defendants' false and misleading statements have caused some readers and potential investors to view LifeMD's business as non-viable, dishonest, and non-reputable.

92.     At least two putative shareholder class action lawsuits have been filed against LifeMD, *i.e.*, *Owens Sr. v. LifeMD, Inc.*, Case No. 1:21-cv-03384 (S.D.N.Y. Apr. 2021) and *Cho v. LifeMD, Inc., et al.*, Case No. 1:21-cv-04004 (S.D.N.Y. May 2021), and more may be filed, which incorporate and will continue to spread the false and defamatory statements in the Report.

93.     LifeMD has and will continue to incur substantial costs in dealing with these meritless suits, which were a foreseeable and intended by-product of the Report.

94.     LifeMD has incurred additional expenses, and will continue to incur expenses, directly attributable to Defendants' false and libelous Report, including but not limited to attorney's fees incurred in connection with this suit, costs to investigate and defend the defamatory statements made by Defendants, and costs associated with responding to third party inquiries regarding the libelous statements made.

95.     LifeMD has also suffered harm to its reputation and goodwill, including but not limited to, damage to relationships with contractual partners, bankers, lenders, and the media, loss of business opportunities and access to markets and investors, and loss of recruiting opportunities.

96.     As a result of Defendants' libelous scheme, Schreiber and Galluppi have suffered devastating reputational and financial harm.

97.     Their standing in the community has been questioned and discredited.

98.     Shortly after the Report was publicized, there were several social media posts within the investment community questioning Schreiber's and Galluppi's involvement with Redwood Scientific, calling them criminals, accusing them of engaging in fraud, questioning their management of the company, and referring to them as clowns.

99.     As a result, they have suffered personal humiliation, mental anguish, and emotional distress.

100.    The full extent of the damage caused by Defendants is not yet known, but it is clear that Defendants and the libelous Report they created and publicized have already caused Plaintiffs a significant amount of damage and will continue to do so.

**FIRST CAUSE OF ACTION**
**Defamation – Libel / Defamation By Implication**
**(Plaintiffs v. All Defendants)**

101.    Plaintiffs repeat and reallege the allegations set forth above as though fully set forth herein.

102.    Defendants authored, published, and widely disseminated the Report without privilege or authorization.

103.    The Report contains statements of fact that are false and/or based upon false or incomplete facts and defamatory impressions about Plaintiffs. The false and defamatory statements, omissions, and implications are referenced above in this Complaint.

104.     Defendants authored and caused to be published and broadly disseminated to the public these false and defamatory statements without sufficient factual bases for making the statements, and did so intentionally, maliciously, and with knowledge of their falsity, or at the very least, with reckless disregard for their truth or falsity.

105.    As alleged above, given the context in which the false statements appear and the definitive tone of the Report, reasonable investors understood Defendants to be conveying provable facts, not opinions, about Plaintiffs, as demonstrated by the significant decrease in LifeMD's stock following the publication of the Report and the subsequent putative shareholder class actions lawsuit that has been filed.

106.    Defendants devised a scheme to fabricate and disseminate the false and defamatory statements to numerous persons through its website (www.culperresearch.com) and its posts on Twitter.

107.    Defendants participated in this insidious scheme to profit from the short positions they had built in LifeMD's stock prior to publication of the Report.

108.    Defendants knew, or should have known, the statements were false when made.

109.   Defendants authored and published these false and defamatory statements and/or conspired to disseminate them for the purpose of manipulating LifeMD's stock price to benefit Defendants' short-selling scheme.

110.   Defendants' actions have damaged Plaintiffs' reputation and cause Plaintiffs to incur substantial expenses.

111.   Defendants' false and defamatory statements have damaged Plaintiffs' relationships with its equity investors, sell-side analysts, debt investors, banks, auditors, lawyers, customers, and suppliers.

112.   The false and defamatory statements authored and published by Defendants have injured Plaintiffs and their business and thus constitute libel per se.

113.   In addition, as intended and endorsed by Defendants, the statements in the Report led to the defamatory implication that Plaintiffs have engaged in fraudulent and unethical business practices.

114.   The publication of the Report and statements therein thus constitutes defamation by implication.

115.   Plaintiffs have suffered, and continue to suffer, damages as a direct and proximate result of the false and defamatory statements and innuendo in an amount to be determined at trial.

116.   In addition, Defendants have engaged in willful and malicious conduct, or conduct that manifests a knowing and reckless indifference toward, and disregard of, the rights of Plaintiffs.

117.    As a result of such conduct, Plaintiffs are entitled to an award of exemplary and punitive damages against Defendants, and all costs, expenses, and attorneys' fees incurred in these proceedings by Plaintiffs.

**SECOND CAUSE OF ACTION**
**Trade Libel**

18

**(LifeMD v. All Defendants)**

118.     Plaintiffs repeat and reallege the allegations set forth above as though fully set forth herein.

119.     Defendants authored, published, and widely disseminated, without privilege or authorization, the Report.

120.     As alleged above, the Report contains statements concerning LifeMD's business that Defendants knew were false and derogatory.

121.     Defendants authored and published the false and derogatory statements about LifeMD that were detrimental to the company and Plaintiffs.

122.     Defendants conspired to publish and disseminate the false and derogatory statements with the intention of interfering with LifeMD's existing and prospective business relationships and diminishing the value of its business.

123.     Defendants' dissemination of these false and derogatory statements was a substantial factor in causing third parties not to have business dealings with Plaintiffs.

124.     Defendants' dissemination of these false and derogatory statements also caused a diminution in value of LifeMD's business, as evidenced by the decline in stock price following the large, short accumulation and, further, following Defendants' publication and dissemination of the Report.

125.     Defendants' actions have been to LifeMD's detriment.

126.     Defendants' fabrication, publication, and dissemination of the false and derogatory statements has damaged LifeMD's reputation, caused LifeMD to lose revenue, and caused it to incur substantial expenses.

127.    Defendants' misstatements and false innuendo also have damaged LifeMD's relationships with its investors, banks, auditors, lawyers, customers, and suppliers.

128.    As a direct result of Defendants' actions, Plaintiffs have incurred special damages including LifeMD having to defend itself against class action lawsuits, costs and fees associated with these lawsuits, and significant expenses in public relations to repudiate the false and defamatory statements made by Defendants, amongst other special damages.

129.    Plaintiffs have suffered, and continue to suffer, damages as a direct and proximate result of the false and derogatory statements in an amount to be determined at trial.

130.    The foregoing conduct of Defendants is the result of willful and malicious or intentionally fraudulent conduct or conduct that manifests a knowing and reckless indifference toward, and disregard of, the rights of LifeMD.

131.    As a result of such conduct, LifeMD is entitled to an award of exemplary and punitive damages against Defendants, and all costs, expenses, and attorneys' fees incurred in these proceedings by Plaintiffs.

### THIRD CAUSE OF ACTION
### Permanent Injunctive Relief
### (Plaintiffs v. All Defendants)

132.    Plaintiffs repeat and reallege the allegations set forth above as though fully set forth herein.

133.    Defendants authored, published, and disseminated false and defamatory statements about Plaintiffs' business practices for their own profit.

134.    Defendants sold short shares of LifeMD's stock prior to the publication of the Report for the sole purpose of profiting from the resulting drop in the share price and have otherwise traded in shares of LifeMD's stock for their financial gain.

135.    Plaintiffs will suffer irreparable harm if Defendants are not permanently enjoined from authoring, publishing, and disseminating false and defamatory statements about Plaintiffs' business practices because Defendants' continued manipulation of LifeMD's stock threatens the company's existence.

136.    Remedies at law are inadequate to fully address the continuing manipulation of LifeMD's stock that has occurred, and continues to occur, as a result of Defendants' actions.

137.    Plaintiffs are attempting prevent Defendants from authoring, publishing, and disseminating any further false and defamatory statements in connection with LifeMD.

138.    The balancing of the equities substantially favors Plaintiffs.

139.    Plaintiffs are entitled to an anti-libel permanent injunction and a mandatory injunction requiring removal of libelous and defamatory statements and publication of appropriate retractions, enjoining Defendants from maintaining, publishing, causing to be published, or disseminating any further false and defamatory statements concerning Plaintiffs.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief as follows:

Entry of judgment in favor of Plaintiffs against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, including:

a.   Awarding compensatory money damages in an amount to be determined at trial;

b.   Awarding punitive damages in an amount sufficient to deter further wrongful and improper conduct;

c.   Ordering Defendants to immediately remove all false and defamatory statements concerning Plaintiffs from www.culperresearch.com, the Twitter handle @CulperResearch, and other social media accounts, and requiring Defendants to publish on www.culperresearch.com, the

Twitter handle @CulperResearch, and other social media accounts a written retraction of its previous false and defamatory statements regarding Plaintiffs;

d.   Permanently enjoining Defendants from authoring, publishing, causing to be published, or disseminating any further false and defamatory statements concerning Plaintiffs;

e.   Awarding costs and expenses incurred in connection with this action, including reasonable attorneys' fees to the extent available under any applicable law;

f.   Awarding prejudgment interest at the maximum legal rate applicable to a judgment issued by this Court; and

g.   Such other and further relief as this Court deems just and proper.

Plaintiffs reserve the right to seek all remedies available at law and equity.

Dated:  May 13, 2021                    Respectfully submitted,


/s/Jessica G. Lucas
S. Manoj Jegasothy, Esquire (PA ID No. 80084)
Jessica G. Lucas, Esquire (PA ID No. 311280)
Gordon Rees Scully Mansukhani, LLP
707 Grant Street, Suite 3800
Pittsburgh, PA 15219
Tel:  (412) 577-7400
Fax:  (412) 347-5461
mjegasothy@grsm.com
jlucas@grsm.com

*Counsel for Plaintiffs LifeMD, Inc., Justin Schreiber, and Stefan Galluppi*